FILED

2026 MAY -8 AM 10: 08

IN THE UNITED STATES DISTRICT COURT CLERK, US DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

BY_____

| | |
|---|---|
| RONALD A. BLAIR, §<br>Plaintiff, §<br>§<br>§<br>v. §<br>§<br>§<br>WINSUPPLY NE SAN ANTONIO TX §<br>CO.; §<br>WINSUPPLY INC.; and §<br>MARC CLEERE, Individually, §<br>Defendants. § | Civil Action No. 1:26CV01216 RP |

## COMPLAINT

Plaintiff Ronald A. Blair files this Complaint against Defendants and alleges as follows:

### I. NATURE OF THE ACTION

1.   This action arises from four categories of unlawful conduct by Defendants:

(a) failure to timely and fully pay Plaintiff's earned, non-discretionary compensation in violation of his employment agreement;

(b) subjecting Plaintiff to repeated sex-based harassment by his supervisor in violation of Title VII;

(c) terminating Plaintiff in retaliation for complaining about sexual harassment and after he also complained about unpaid earned compensation; and

(d) publishing false factual statements to third parties in Plaintiff's industry asserting that Plaintiff had engaged in extensive litigation against judges, contractors, and others, thereby damaging his professional reputation and interfering with specific employment and business opportunities.

2.    Plaintiff complained on January 8 and January 12, 2026, that Defendants were failing to pay earned compensation, and on January 12, 2026 he also complained that his supervisor had engaged in sexually explicit, sex-specific conduct. Within three days of his written escalation, Defendants terminated his employment without investigation and without identifying any performance deficiency. Defendants then communicated false factual statements regarding Plaintiff's alleged litigation history to prospective employers and industry decision-makers, including representatives of Milford Companies and participants within the contractor network associated with the SpaceX project. Defendants' stated basis for termination is set forth in the January 15, 2026 termination letter attached hereto as Exhibit A, which asserts that Plaintiff filed lawsuits against a federal judge, industry executives including Kevin Murphy, contractors, and court personnel—factual assertions that are false and objectively verifiable from public court records.  Plaintiff alleges that Defendants relied on Plaintiff's alleged litigation history as a stated basis for termination even though they had known of his prior litigation before hiring him and had not treated it as disqualifying, and that this rationale was first invoked after his protected activity and used both internally to justify termination and externally in communications that harmed his professional opportunities. Plaintiff's January 12, 2026 written complaint is attached hereto as Exhibit D.

3.    As a direct and proximate result of Defendants' conduct, Plaintiff suffered loss of earned compensation, termination of his employment, loss of a specific and actively developing employment opportunity with Milford Companies, loss or disruption of an anticipated employment opportunity associated with Aquatherm that was under active discussion in connection with anticipated structural changes to its distribution model, disruption of ongoing

industry relationships, and substantial damage to his professional reputation and earning capacity.

4.    These statements were communicated through multiple identifiable channels, including:

(a) direct communications by Cleere to Milford decision-makers that resulted in the cessation of Plaintiff's candidacy;

(b) communications to individuals within the contractor network associated with the SpaceX project, as confirmed by third-party statements; and

(c) additional communications to industry participants whose identities are presently known to Defendants; these communications formed part of a pattern of repeated dissemination of the same false narrative concerning Plaintiff's alleged litigation history.

5.    Defendants' conduct gives rise to claims for breach of contract; retaliation and hostile work environment under Title VII; and Texas-law claims for defamation, business disparagement, and tortious interference with prospective business relations.

## II. PARTIES

6.    Plaintiff Ronald A. Blair is an individual and a resident of the State of Texas. He was employed by Defendants during the period described in this Complaint.

7.    Defendant Winsupply NE San Antonio TX Co. is a foreign for-profit corporation organized under the laws of Delaware and registered to do business in Texas. It does business as "Romar Supply & Steel Fabrication – a Winsupply Company" and operates an industrial distribution branch in San Antonio, Texas. Although that branch served as Plaintiff's nominal home branch, Defendants assigned Plaintiff to develop and service accounts primarily in the Austin metropolitan area, including Bastrop County and relationships with Austin-area

contractors, and the majority of Plaintiff's work activities and project engagements occurred in that area. Winsupply NE San Antonio TX Co. may be served with process through its registered agent, Corporation Service Company d/b/a CSC – Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701.

8.      Defendant Winsupply Inc. is a foreign for-profit corporation organized under the laws of Delaware with its principal place of business in Dayton, Ohio. Winsupply Inc. exercised centralized control over payroll, human resources, and employment policies applicable to Plaintiff, including issuing Plaintiff's Form W-2 and maintaining payroll authority, while Defendant Winsupply NE San Antonio TX Co. directed Plaintiff's day-to-day work activities, jointly constituting Plaintiff's employer. Winsupply Inc. may be served with process through its agent, Corporation Service Company, 1160 Dublin Road, Suite 400, Columbus, Ohio 43215.

9.      Winsupply Inc. provides centralized services to its local companies, including payroll processing, wage statement issuance, maintenance of employment records, accounting, human-resources support, and operational oversight. Winsupply Inc. exercised control over material aspects of Plaintiff's employment, including his compensation administration, the handling and routing of his complaints, and participation in employment-related decision-making concerning his January 2026 escalation and termination.

10.    Plaintiff's W-2 was issued through Winsupply, Inc. Employee Services, and his January 12, 2026 escalation was directed to Winsupply corporate leadership, reflecting Winsupply Inc.'s involvement in employment-related functions affecting him.

11.    Defendant Marc Cleere is an individual residing in Texas who, at all relevant times, served as President of Winsupply NE San Antonio TX Co. and exercised supervisory

authority over Plaintiff's employment. He may be served with process at his place of business, Winsupply NE San Antonio TX Co., located in San Antonio, Texas.

12.    At all relevant times, Winsupply NE San Antonio TX Co. and Winsupply Inc., separately and/or as an integrated enterprise or joint employers, qualified as employers within the meaning of Title VII. Separately or collectively, Defendants employed fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year. The centralized functions, corporate involvement, and control over Plaintiff's employment described above support Title VII coverage and joint-employer status at the pleading stage. Unless otherwise specified, references to "Defendants" include each Defendant acting individually, jointly, or through agents acting within the scope of their authority, and the conduct described herein is attributed to each Defendant based on their direct participation, direction, ratification, or control.

### III. JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff asserts claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2 and 2000e-3. The Court has supplemental jurisdiction over Plaintiff's related state-law claims, including breach of contract and tort claims, under 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy. Plaintiff timely exhausted his administrative remedies as to his Title VII claims. Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 460-2026-05401, and the EEOC thereafter issued Plaintiff a Notice of Right to Sue on April 9, 2026. Plaintiff received the Notice of Right to Sue on or about April 9, 2026. Copies of the Charge of Discrimination and Notice of Right to

Sue are attached hereto as Exhibits B and C. Plaintiff files this action within ninety days of his receipt of the EEOC's Notice of Right to Sue and within all applicable limitations periods.

14. Venue is proper in this Court, and in the Austin Division of the Western District of Texas, under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred within this Division, including where Plaintiff performed his work, received employment-related communications and payroll records, and experienced economic and reputational harm resulting from Defendants' conduct.

15. During the period described in this Complaint, Plaintiff resided in Leander, Texas, within Williamson County, which lies within the Austin Division of the Western District of Texas, and he performed the majority of his work in the Austin metropolitan area from that residence and surrounding locations. Defendants directed employment-related communications and payroll records, including Plaintiff's 2025 Form W-2, to his Leander address within this Division.

16. Events giving rise to Plaintiff's claims include work performed on a major commercial construction project in Bastrop County, Texas, as well as Defendants' communications and directives directed to, and affecting, the Austin-area contractor network. That network includes material non-party witnesses, disrupted professional relationships, and lost opportunities, including those associated with the SpaceX project, the Milford opportunity, and Aquatherm-related opportunities. These events and relationships were centered in the Austin metropolitan area, and the material non-party witnesses and disrupted relationships are predominantly located within the Austin Division.

## IV. FACTUAL BACKGROUND

### A. Pre-Employment Context and Hiring Rationale

17. Plaintiff is an experienced professional in the commercial mechanical piping industry with decades of experience in technical sales, product training, and the development of vendor and contractor relationships within the construction and mechanical contracting sectors.

18. Prior to his employment with Defendants, Plaintiff maintained longstanding, active professional relationships within the commercial construction and mechanical contracting industries, including relationships associated with major developments such as the SpaceX project that were generating ongoing business opportunities and project engagements at the time Plaintiff joined Defendants.

19. Before hiring Plaintiff, Defendant Marc Cleere knew that Plaintiff had previously been involved in employment-related litigation with Ferguson Enterprises.

20. During the hiring process in or about July 2025, Plaintiff was interviewed not only by Cleere, but also by members of the local company's Board of Directors, including Roger Lewis, who also served in a regional leadership role within the Winsupply organization. Cleere discussed Plaintiff's industry experience and reputation, stated that Plaintiff was being hired specifically to develop vendor partnerships and expand industry relationships, and encouraged Plaintiff to leverage his existing professional network to generate new business opportunities for Defendants. Cleere expressed no concern that Plaintiff's prior Ferguson litigation disqualified him from the role.

### B. Early Employment and Performance

21. On July 21, 2025, Defendants, acting through Cleere, hired Plaintiff to perform business development, expand vendor relationships, and develop market opportunities in Austin,

San Antonio, and surrounding Texas markets, with a primary focus on Austin. In practice, Plaintiff's day-to-day work, major project assignments, and contractor-facing activities were concentrated in the Austin metropolitan area and nearby counties, including Bastrop County, rather than in San Antonio.

22. During the hiring process and early in Plaintiff's employment, Cleere stated that, as business in the Austin market developed, Defendants intended to establish an Austin-area branch and that Plaintiff would be expected to help lead that expansion and participate in that branch at an ownership level.

23. Cleere understood that Plaintiff's role included leveraging his existing industry relationships, including those with manufacturers such as Aquatherm and contractor-side decision-makers associated with major projects, and encouraged Plaintiff to use those relationships to generate new business for Defendants.

24. Cleere stated that Plaintiff's total annual compensation would be $150,000.00, together with reimbursement for use of Plaintiff's vehicle and $100.00 per month for use of Plaintiff's cell phone. After the parties reached agreement on Plaintiff's employment and before the subsequent written offer was issued, Cleere changed the vehicle component from mileage reimbursement to a flat allowance of $800.00 per month for use of Plaintiff's vehicle.

25. The subsequent written offer set out the manner in which Plaintiff's agreed compensation would be paid, including a monthly non-discretionary payment component. Plaintiff promptly informed Cleere that the written calculation of that monthly component did not conform to the parties' agreed annual compensation of $50,000 for that component because the stated monthly figure reflected a reduced per-payment amount inconsistent with twelve equal monthly payments. Plaintiff made clear that the monthly component was fixed, non-discretionary

compensation totaling $50,000 annually. Cleere rejected Plaintiff's objection and implemented the reduced payment structure, but confirmed that the monthly component constituted part of Plaintiff's fixed total annual compensation of $50,000. Plaintiff thereafter continued working, and Defendants accepted his continued performance, in mutual understanding that the monthly component would be paid in full as part of the agreed total compensation. Defendants' compensation structure, including the monthly component, was presented as a fixed, non-discretionary obligation and not subject to unilateral reduction after acceptance. Through Plaintiff's continued performance and Defendants' acceptance of that performance and issuance of compensation under that structure, the parties formed a binding agreement as to the total annual compensation and required payments. Defendants nevertheless paid less than the agreed amount.

26. During his employment, Plaintiff actively engaged with contractors, manufacturers, and customers, including business development, technical support, and relationship management within the commercial mechanical piping sector.

27. Plaintiff also performed work beyond the local office, including attending industry events and providing product training and technical presentations for other Winsupply network companies.

28. Plaintiff developed and strengthened vendor relationships for Defendants, including introducing and advancing Defendants' relationship with Aquatherm, a polypropylene piping manufacturer with whom Plaintiff had an established professional relationship based on prior national training work and direct relationships with Aquatherm leadership.

29. Other employees, including Maria Pesqueda, observed Plaintiff's performance and described him as knowledgeable and effective, contributing to significant project opportunities, and indicated they did not understand Cleere's negative treatment of Plaintiff.

30. Plaintiff maintained frequent and ongoing communications with contractor-side decision-makers and industry participants, including Rowdy May, Joe White, and Jeromy Faggard, among others with whom Plaintiff had longstanding and active business relationships. These interactions included regular business communications, trainings, coordination on active projects, and development of future opportunities.

31. In approximately September 2025, Cleere instructed Plaintiff—based on direction he represented he received from Winsupply Inc.'s corporate leadership—to remove LinkedIn posts referencing Plaintiff's prior Ferguson litigation. Plaintiff complied the same day. Defendants took no disciplinary action, and Cleere confirmed that the matter was resolved and that Plaintiff should continue in his role. This interaction confirms that Defendants, including corporate leadership, were aware of Plaintiff's prior litigation and did not view it as a disqualifying risk at that time.

## C. Workplace Harassment and Hostile Conduct

32. During Plaintiff's employment, Defendant Cleere engaged in repeated conduct directed at Plaintiff involving explicit sexual comments, crude sexual references, sexually suggestive gestures, and remarks concerning Plaintiff's body and genitals, including in the presence of coworkers and, at times, customers and industry contacts. Plaintiff did not welcome this conduct, found it offensive and humiliating, and made clear through his objections and reactions that the conduct was unwelcome. The conduct was directed specifically at Plaintiff as a

male and included repeated comments and gestures targeting his male anatomy and masculinity, rather than generalized workplace vulgarity.

33. On one occasion in or about fall 2025, during a business lunch attended by contractor personnel, including representatives from Brandt and other customer-side decision-makers, Cleere engaged in sexually explicit conduct directed at a waiter, including exaggerated oral sex gestures and simulated gagging based on the waiter's genital size, and then directed similar gestures toward Plaintiff, stating that Plaintiff would perform the same act but only "slightly coughing," implying that Plaintiff's genital size was small. These statements and gestures were made in a public, customer-facing setting in front of contractor representatives and decision-makers and were directed at Plaintiff, undermining his professional credibility with individuals whose perception directly affected his ability to perform his role and develop business opportunities. These statements were explicitly tied to Plaintiff's male anatomy and were not generalized workplace vulgarity. Cleere did not direct comparable conduct toward female employees, and the conduct toward Plaintiff was uniquely sexualized and gender-specific.

34. During a meeting in or about late 2025 in an open office area attended by Plaintiff, Cleere, Victoria Yvarra, and Maria Pesqueda, with at least one additional employee within earshot, Cleere stated that Plaintiff could place Lifesaver candies on his penis and, when hungry, reach down and take one. This comment was made in a group setting, was directed specifically at Plaintiff, and explicitly referenced Plaintiff's genitals. Following the meeting, Maria Pesqueda told Plaintiff that Cleere's conduct was "disgusting" and confirmed that she observed the incident and understood it to be directed at Plaintiff.

35. In or about December 2025, in connection with a discussion about a company Christmas party, Cleere mocked Plaintiff by suggesting that Plaintiff should wear a "spandex elf outfit," continuing the pattern of targeted ridicule.

36. On multiple occasions in late 2025 and early January 2026, including during a company Christmas event attended by employees and their families, Cleere publicly stated, "I know I can be a dick," acknowledging that his conduct toward employees was offensive while attempting to justify it.

37. When Plaintiff objected to Cleere's conduct, Cleere responded with physical intimidation—rolling up his sleeves, approaching Plaintiff to within inches, and stating, "you think you can take me, come on!"—in a manner that a reasonable person would understand as a warning against further objection or escalation. This conduct created a reasonable apprehension that raising complaints through internal channels would result in hostile or retaliatory consequences. This intimidation occurred in direct response to Plaintiff objecting to sex-based conduct, reinforcing that the conduct was tied to Plaintiff's sex.

38. Cleere also engaged in aggressive and confrontational conduct toward Plaintiff, including yelling and placing Plaintiff in a "damned if you do, damned if you don't" position regarding office-presence versus field-work expectations.

39. On multiple occasions, Cleere directed Plaintiff to return to the office after field work without clear business necessity, resulting in unnecessary travel and disruption. These shifting directives formed part of a broader pattern of supervisory hostility and inconsistent criticism regardless of Plaintiff's actions.

40. Other employees, including Maria Pesqueda and another employee, observed Cleere's conduct and stated that Plaintiff appeared to be singled out for negative treatment.

Pesqueda further stated that Cleere's conduct was wrong and that she feared retaliation if she reported it.

**D. Plaintiff's Compensation Structure and Wage Complaints**

41. Under the terms of Plaintiff's employment, Defendants compensated Plaintiff through a combination of a biweekly base salary and a fixed, non-discretionary annual compensation component of $50,000, to be paid in regular monthly installments over a one-year period unless Defendants transitioned Plaintiff earlier to a different compensation structure. This monthly component was not discretionary and was required to be paid in full over the applicable period as part of Plaintiff's agreed total compensation.

42. At the time of hiring and prior to issuance of the written offer letter, Cleere informed Plaintiff that his total annualized compensation would be $150,000, structured as $100,000 in biweekly base salary payments and $50,000 in regular monthly payments. Cleere represented that these monthly payments were part of Plaintiff's fixed compensation package and were not discretionary. Plaintiff's compensation also included an allowance of $800 per month for his vehicle and $100 per month for his phone.

43. The subsequent offer letter reflected base salary payments of $3,846.14 paid biweekly and described a monthly commission-cycle, non-discretionary payment of $3,846.12, which purported to correspond to $50,000 annually. Plaintiff objected that, because Defendants described this component as a monthly payment, the stated amount reduced the per-payment figure below what was required to satisfy the agreed $50,000 annual component through twelve standard monthly installments. Twelve monthly payments of $3,846.12 would total only $46,153.44, not $50,000, confirming that the stated monthly amount did not satisfy the parties' agreed annual compensation component as presented. Plaintiff did not agree to a reduced total

compensation amount and expressly objected that the stated monthly figure did not conform to the parties' agreed compensation structure.

44. Beginning as early as August 2025, Defendants paid Plaintiff less than the amount required to satisfy the agreed $50,000 annual monthly compensation component. Defendants implemented a reduced per-payment structure that resulted in recurring underpayment of that fixed compensation obligation. Plaintiff objected because, under the parties' agreement, the full $50,000 annual component was required to be paid in regular monthly installments and not reduced through a lower recurring payment amount.

45. Plaintiff raised these recurring shortfalls with Cleere during his employment. In doing so, Plaintiff did not seek to renegotiate compensation or request a discretionary adjustment; he objected that Defendants were failing to pay compensation that was fixed under the parties' agreement and due on regular pay dates.

46. At the beginning of January 2026, Plaintiff was scheduled to receive one of the fixed monthly commission-cycle, non-discretionary payments reflected in the offer letter, but that payment was not deposited when expected.

47. On or about January 8, 2026, Plaintiff notified Cleere that the scheduled monthly payment had not been deposited and complained that Defendants were withholding and delaying payment of compensation that was fixed, non-discretionary, and already due under the compensation arrangement. Plaintiff stated, in substance, that the monthly payment was required to be paid in full and when due and that Defendants' failure to do so was in violation of applicable wage laws.

48. Plaintiff subsequently contacted Winsupply corporate personnel and left a message requesting a return call regarding the same payment issue. In doing so, Plaintiff again

raised that Defendants had failed to timely pay compensation that had already been earned and was due. No response was received. This occurred prior to Plaintiff's written escalation on January 12, 2026.

49. These compensation issues—including recurring underpayments of fixed monthly compensation and the untimely January 2026 payment—remained unresolved. Defendants did not correct the identified underpayments or the untimely payment before terminating Plaintiff.

50. On January 12, 2026, Plaintiff escalated his complaints in writing to Winsupply corporate leadership, including Roger Lewis and Rob Ferguson. In that communication, Plaintiff complained not merely that Cleere's behavior was rude or inappropriate, but that Cleere had engaged in sexually inappropriate, sex-specific conduct and ridicule directed at Plaintiff, including conduct referencing Plaintiff's genitals and body, and Plaintiff requested that Winsupply investigate and address that misconduct. A true and correct copy of Plaintiff's January 12, 2026 written complaint is attached hereto as Exhibit D. Plaintiff's complaints expressly opposed conduct he reasonably believed constituted unlawful sex-based harassment under Title VII, independent of and separate from his wage-related complaints.

51. In that same January 12, 2026 escalation, Plaintiff expressly asserted that Defendants were failing to fully and timely pay earned wages, including fixed, non-discretionary monthly payments required to be paid when due.

52. On that same day, Roger Lewis, an Area Leader and Cleere's supervisor, contacted Plaintiff in response to the escalation, discussed Plaintiff's concerns, and stated that he handled or "played the role of HR" for matters of this type. Lewis further stated that he did not want to lose Plaintiff and asked whether Plaintiff would consider a national-level role within

Winsupply. This immediate management response confirms that Plaintiff's complaints reached decision-making personnel and were being addressed at a level above Cleere.

53. Later on January 12, 2026, Cleere confronted Plaintiff regarding the escalation to corporate leadership, criticized Plaintiff for going "around his back," stated that "trust had been lost," and indicated that it was up to Plaintiff to repair that trust. This reaction directly tied Plaintiff's protected complaints to Defendants' subsequent treatment of him.

**E. Termination**

54. On January 15, 2026—three days after Plaintiff's January 12, 2026 written escalation—Defendants terminated Plaintiff's employment effective immediately. Prior to termination, Defendants had not identified any performance deficiencies, policy violations, or disciplinary concerns. Defendants did not initiate or communicate any investigation into Plaintiff's wage or harassment complaints before terminating him, and no materially changed circumstance other than Plaintiff's January 12, 2026 complaints occurred between the escalation and the termination.

55. The termination letter asserted Plaintiff's prior litigation history as the stated basis for termination. The factual assertions used to support that reason were false and materially misleading, including through omission and distortion of public-record facts, and inconsistent with Defendants' prior knowledge and treatment of Plaintiff's litigation history, which had been known before hiring and had not resulted in any discipline or adverse action. Defendants invoked this explanation only after Plaintiff engaged in protected activity, and it was used as a pretextual justification for a retaliatory termination decision. The termination letter did not identify any performance deficiencies, misconduct, or policy violations, and no change in Plaintiff's

performance or conduct occurred between his January 12, 2026 complaints and his termination, further supporting that the asserted reason was not the true basis for Defendants' decision.

56. Defendants' reliance on Plaintiff's alleged litigation history as the stated basis for termination, combined with their subsequent dissemination of false and exaggerated statements concerning that same subject to third parties, reflects a single, coordinated course of conduct in which Defendants revived, distorted, and weaponized a false narrative about Plaintiff only after his protected complaints, using that narrative both as a pretext to justify termination and as a means to interfere with his future employment opportunities.

**F. Post-Termination Statements, Interference, and Resulting Economic Harm**

57. In the period leading up to his January 2026 termination, Plaintiff was engaged in discussions concerning a national-level employment opportunity with Milford Companies representing a concrete, near-term position within his industry.

58. These discussions involved an identified role, identified decision-makers, and coordinated steps toward formalizing the position. Milford representative Jeremy Hohn stated that Plaintiff met the company's needs and, after Plaintiff disclosed his employment with a Winsupply company, continued discussions and indicated the position could be formally posted to address the "we do not hire from within" issue and facilitate Plaintiff's hiring. The position was expected to be formally posted and offered to Plaintiff, and the parties had progressed beyond preliminary discussions to coordinated steps toward formalizing the role.

59. Before Plaintiff received the termination letter, Milford representative Michael Harris informed Plaintiff that Milford would not continue discussions because of statements Cleere had made about Plaintiff. Harris stated that Cleere told him that Plaintiff "had sued a federal judge," "had sued contractors," and "had sued executives in the industry," and that

Plaintiff would create legal problems for any company that hired him. These statements were conveyed as factual warnings designed to dissuade Milford from proceeding, and, as a direct result of those statements, Milford declined to continue discussions with Plaintiff.

60. During the same period, Plaintiff was in communication with Aquatherm, a polypropylene piping manufacturer with whom he had a longstanding professional relationship. Plaintiff had previously served as Aquatherm's National Training Director and worked directly with Aquatherm leadership, including Michael Segala.

61. In late 2025, Segala informed Plaintiff that Aquatherm would be making structural changes to its distribution model in late January 2026 and that he intended to raise with Aquatherm leadership the possibility of bringing Plaintiff on board in a regional management role following those changes, with compensation consistent with Plaintiff's expectations. Segala's statements, the timing of the planned structural changes, and the parties' ongoing discussions reflected more than a speculative possibility; they reflected a concrete, near-term opportunity that Plaintiff reasonably expected to formalize into a role following the January 2026 distribution changes.

62. Plaintiff was actively weighing the Milford and Aquatherm opportunities prior to his January 12, 2026 escalation to Winsupply corporate leadership.

63. During the January 12–15, 2026 period, Milford communications, which had been active and progressing toward formalizing Plaintiff's role, abruptly ceased in close temporal proximity to Cleere's communications with Milford concerning Plaintiff. The abrupt cessation of communications occurred immediately after Cleere's statements to Milford. Plaintiff is not aware of any independent business reason for this change and alleges that, absent Defendants' interference, there was a reasonable probability he would have secured the Milford position.

64. Following Plaintiff's termination, Aquatherm-related communications concerning the prospective role ceased.

65. The termination letter asserts statements of fact concerning Plaintiff's litigation history, including that Plaintiff had sued Kevin Murphy, President and CEO of Ferguson Enterprises, Judge Hoyt, an Article III federal judge, contractors, and court personnel, and characterizes Plaintiff as a vexatious litigator engaged in numerous and harassing lawsuits.

66. Plaintiff did not sue certain individuals and entities identified in the letter, and the letter does not accurately reflect the public dockets in Plaintiff's prior cases. Plaintiff has not filed any civil action naming Kevin Murphy, Judge Hoyt, any court personnel, or any contractors associated with the SpaceX project as defendants, and his prior litigation history is limited to a small number of employment-related cases against a former employer, Ferguson Enterprises and related entities, which are matters of public record.

67. The termination letter also misidentifies Plaintiff as "Ronald A. Harris" in multiple places and contains factual assertions regarding Plaintiff's litigation history that are contradicted by publicly available court records, further demonstrating the inaccuracy and unreliability of Defendants' asserted narrative. The letter also contains additional indicia of unreliability, including a handwritten date that does not correspond to the actual termination date.

68. Before and after Plaintiff's termination, Defendants, including Cleere, communicated false statements regarding Plaintiff's alleged litigation history to third parties outside any internal employment decision-making process, including Milford decision-makers and other industry participants within Plaintiff's professional network. Cleere made these statements while acting as President of Winsupply NE San Antonio TX Co., within the scope of

his actual or apparent authority, and/or while using authority and information obtained through his supervisory role. Defendants Winsupply NE San Antonio TX Co. and Winsupply Inc. are liable for Cleere's statements to the extent they were made within the course and scope of his employment, were ratified, or were made using corporate authority. These statements were made by Cleere to specific third parties, including Milford decision-maker Michael Harris, during direct communications occurring in or about January 2026.

69. In a recorded telephone call after Plaintiff's termination, Kevin Wilson informed Plaintiff that persons associated with the SpaceX project had been instructed by Romar Supply — Defendants' operating entity — not to engage with Plaintiff for "legal reasons." Wilson's statement, made in the context of Plaintiff's recent termination and in direct response to Plaintiff's inquiry about his exclusion from the SpaceX contractor network, supports a plausible inference that Defendants communicated a similar litigation-risk narrative within the SpaceX contractor network, consistent with the false narrative communicated to Milford and memorialized in Exhibit A.

70. Defendants communicated substantially similar statements to additional identifiable individuals within the SpaceX contractor network, including directives that Plaintiff should not be engaged for "legal reasons." The substance of what was communicated to the SpaceX network is not yet established but is supported by a plausible inference arising from: (a) Defendants' use of that identical narrative in Exhibit A to justify Plaintiff's termination; (b) Milford representative Harris's direct account of Cleere's statements using that same narrative; and (c) Wilson's confirmation that Romar directed exclusion of Plaintiff for "legal reasons" within the same timeframe. Plaintiff alleges that these recipients' perceptions affected his ability to obtain work, maintain project access, and preserve professional relationships within that

network. Plaintiff further alleges that these communications occurred within a narrow timeframe immediately following his termination and involved individuals with authority to influence hiring and project participation decisions.

71. In communications with Plaintiff, Cleere acknowledged that he had a personal relationship with Michael Harris of Milford and understood that statements about Plaintiff's alleged litigation history would affect Plaintiff's professional opportunities, reflecting Cleere's awareness that his communications concerning Plaintiff would reach and influence industry decision-makers.

72. Following Defendants' dissemination of these statements, multiple independent industry participants with whom Plaintiff had longstanding business relationships—including Rowdy May, Joe White, and Jeromy Faggard—ceased communications with Plaintiff within the same timeframe. In the days immediately following Plaintiff's termination and Defendants' dissemination of the false and misleading statements described above, multiple active employment opportunities and professional communications involving Plaintiff were delayed, suspended, or ceased altogether. This abrupt disruption, occurring within a compressed time period and following Defendants' statements to industry participants, supports Plaintiff's allegation that a communicated narrative affected his professional reputation and resulted in the loss of prospective business relationships, identifiable economic opportunities, and a measurable interruption in his expected income stream.

73. The same core narrative used by Defendants to justify Plaintiff's termination— that Plaintiff was a litigation-prone individual who had sued judges, contractors, executives, and others—was also communicated externally to third parties in Plaintiff's industry.

74. The near-simultaneous cessation of communications across multiple independent industry participants is consistent with a communicated narrative affecting those relationships.

75. The affected relationships were longstanding, active, and independently developed by Plaintiff prior to his employment with Defendants, and they had continued without interruption until the period immediately following Defendants' statements.

76. As a result of these events, Plaintiff lost the Milford opportunity and suffered the loss or disruption of the anticipated Aquatherm-related opportunity that had progressed through discussions with Aquatherm leadership.

77. Plaintiff also lost the ability to pursue consulting, project-related, vendor-development, and relationship-driven opportunities within the contractor network associated with the SpaceX project and experienced disruption of ongoing business relationships within his professional network.

78. Because Plaintiff's work and earning capacity depended substantially on industry access, reputation, and recurring relationship-based opportunities, the harm extended beyond a single lost job opening.

79. Prior to his termination, Plaintiff intended to continue working in the commercial mechanical piping industry for several more years and had the experience, relationships, and active opportunities to do so.

80. Following Defendants' conduct, Plaintiff has been unable to secure comparable opportunities within his primary industry at compensation levels reasonably consistent with his pre-termination earnings history and contemporaneous market opportunities.

81. Plaintiff has suffered substantial economic loss, including lost income estimated at approximately $40,000 through March 2026, exclusive of continuing losses thereafter.

82. For several years preceding Plaintiff's employment with Winsupply, Plaintiff's annual income was at or above $150,000. The Milford opportunity involved a national-level role with compensation discussed at or around $150,000 annually, and the Aquatherm regional role under discussion was expected to be within a similar range. Plaintiff's damages include lost wages, lost future earnings, lost business opportunities, and other economic losses proximately caused by Defendants' conduct, and they continue to accrue.

## V. CAUSES OF ACTION

Plaintiff does not assert Title VII claims against Defendant Cleere individually but asserts state-law claims against him based on his personal participation in the tortious conduct described herein.

## COUNT I
## BREACH OF CONTRACT — FAILURE TO PAY EARNED WAGES
(Texas Common Law)
(Against Winsupply NE San Antonio TX Co. and Winsupply Inc. Only)

83. Plaintiff repeats and incorporates by reference the allegations set forth in paragraphs 1 through 82 as if fully set forth herein.

A. Existence of Contract and Compensation Terms

84. Plaintiff's employment included a compensation agreement under which Defendants agreed to pay Plaintiff a biweekly base salary and a fixed monthly payment component for a one-year period unless Defendants transitioned Plaintiff earlier to a different compensation structure. That monthly component was a material term of the parties' agreed compensation arrangement, was part of the total compensation promised for Plaintiff's services, was not left to future discretion, and was required to be paid in the agreed amount and on the agreed schedule. This monthly component was not a discretionary bonus or sales-contingent commission, but a fixed and non-discretionary portion of Plaintiff's agreed annual compensation.

85. As alleged in ¶¶ 24–25 and 41–43, Cleere informed Plaintiff that his total annualized compensation would be $150,000, structured as $100,000 in biweekly base salary payments and $50,000 in regular monthly payments, and the written offer letter specified the amounts and timing of those payments. Defendants represented that the monthly commission-cycle payments were part of Plaintiff's fixed, non-discretionary compensation package and were not discretionary.

B. Plaintiff's Performance

86. As alleged in ¶¶ 21, 23, and 26–30, Plaintiff performed his obligations under the employment agreement by carrying out his assigned duties in business development, vendor and contractor relationship management, project engagement, and related responsibilities, and by raising compensation discrepancies and payment failures through appropriate channels.

C. Defendants' Breach

87. As alleged in ¶¶ 43–49, Defendants failed to pay the full amount of the fixed $50,000 annual compensation component agreed to be paid through monthly installments and failed to timely make at least one scheduled payment. Beginning as early as August 2025, Defendants implemented a reduced payment structure that resulted in recurring underpayment of that fixed compensation obligation and, in January 2026, failed to deposit a scheduled payment when due. As reflected in the payment figures alleged above, the reduced monthly amount implemented by Defendants could not satisfy the agreed $50,000 annual component over twelve months. The breach is measured against Defendants' agreed total annual obligation of $50,000 for the monthly component, not merely the reduced installment amounts unilaterally implemented by Defendants.

Page 24

88. As alleged in ¶¶ 41–49, the monthly payment component was part of the compensation Defendants agreed to pay Plaintiff during his employment, and Defendants' recurring shortfalls and delayed January 2026 payment constituted a failure to pay compensation in the amount and on the schedule required by the parties' agreement.

89. As alleged in ¶¶ 45, 47–49, Plaintiff notified Cleere and Winsupply corporate personnel that Defendants were withholding and delaying payment of fixed compensation that had already been earned and was due, but Defendants did not correct the identified underpayments or the untimely January 2026 payment before terminating Plaintiff, and those breaches remained uncured. At all relevant times, Defendants accepted the benefits of Plaintiff's performance while failing to pay the full agreed compensation, thereby ratifying the compensation agreement and breaching its payment terms.

D. Damages

90. As a direct and proximate result of Defendants' failure to timely and fully pay compensation owed under the agreement, Plaintiff has suffered damages including unpaid and underpaid compensation, loss of the use of those funds when due, and related economic harm measurable from the dates of the shortfalls and delayed payments.

91. Plaintiff is entitled to recover all damages available under Texas law for breach of contract, including unpaid and underpaid wages, pre-judgment and post-judgment interest, and any other relief the Court deems just and proper.

**COUNT II**
**TITLE VII — RETALIATION**
(42 U.S.C. § 2000e-3)
(Against Winsupply NE San Antonio TX Co. and Winsupply Inc. Only)

92. Plaintiff repeats and incorporates by reference the allegations set forth in paragraphs 1 through 91 as if fully set forth herein.

A. Protected Activity

93. As alleged in ¶¶ 32–40, Plaintiff was subjected to repeated sex-specific comments, gestures, and humiliating conduct by Defendant Cleere directed at Plaintiff's body, genitals, and masculinity in workplace and customer-facing settings, conduct that Plaintiff reasonably believed constituted unlawful sexual harassment under Title VII.

94. As further alleged in ¶¶ 50–52, Plaintiff complained to Defendants, including in his January 12, 2026 escalation to Winsupply corporate leadership, that Cleere had engaged in sexually inappropriate, sex-specific conduct directed at Plaintiff's body and genitals and that the conduct was serious enough to require corporate intervention and investigation.

95. Plaintiff's complaints were sufficiently specific to communicate that he was opposing conduct he reasonably believed to be unlawful under federal anti-discrimination law, rather than merely objecting to ordinary workplace friction, management style, or non-discriminatory profanity.

B. Employer Knowledge

96. As alleged in ¶¶ 50, 52, and 53, Defendants, including Cleere and Winsupply corporate leadership, received Plaintiff's complaints regarding sexual harassment and hostile work environment and were aware of those complaints before the decision to terminate Plaintiff was carried out.

97. Defendants therefore had actual knowledge of Plaintiff's protected activity at the time of the termination decision.

C. Adverse Employment Action

98. As alleged in ¶ 54, Defendants terminated Plaintiff's employment on January 15, 2026.

D. Causal Connection

99. As alleged in ¶¶ 50 and 54, Plaintiff's termination occurred three days after his complaint of sex-based harassment, which alone constitutes protected activity under Title VII, establishing a strong inference of causation independent of any wage-related complaint.

100. As alleged in ¶ 53, causation is further supported by Cleere's reaction to Plaintiff's escalation: Cleere expressly criticized Plaintiff for going "around his back," stated that trust had been lost, and tied Plaintiff's protected escalation to a deterioration in Plaintiff's standing with management.

101. As alleged in ¶ 54, Defendants did not conduct any investigation into Plaintiff's complaints, did not take remedial action, and did not identify any performance deficiencies prior to terminating Plaintiff.

102. As alleged in ¶ 55, Defendants asserted that Plaintiff's prior litigation history was the basis for termination, but that assertion was false and was first invoked only after Plaintiff engaged in protected activity.

103. As alleged in ¶¶ 19–20, 31, and 55, that stated reason was pretextual. Defendants were aware of Plaintiff's prior litigation history before hiring him and reaffirmed their acceptance of it during his employment, including after the September 2025 LinkedIn issue. Defendants did not treat that history as disqualifying until immediately after Plaintiff complained of wage violations and sexual harassment, at which point they revived and mischaracterized it to justify termination. Defendants' stated reliance on Plaintiff's prior litigation history is implausible as a legitimate basis for termination because that information was known and accepted by Defendants prior to hiring and throughout Plaintiff's employment, and was only invoked after Plaintiff engaged in protected activity.

104. The close temporal proximity between Plaintiff's protected activity and his termination, Cleere's express reaction to Plaintiff's escalation, Defendants' failure to investigate or remediate Plaintiff's complaints, and Defendants' sudden and inconsistent reliance on a previously known and misrepresented litigation narrative together plausibly establish that Plaintiff's protected activity was the but-for cause of Defendants' decision to terminate his employment, and that the asserted litigation-based justification was a pretext for retaliation.

E. Willfulness and Punitive Damages

105. Defendants' retaliatory conduct, as described in ¶¶ 50, 52–55, was undertaken with malice or, at minimum, with reckless indifference to Plaintiff's federally protected rights under Title VII. Defendants, including management-level employees such as Cleere, Roger Lewis, and corporate representatives including Rob Ferguson, were aware that Plaintiff had engaged in protected activity by complaining of sexual harassment and nevertheless chose to terminate him three days later without conducting any meaningful investigation or taking remedial action.

106. Despite their obligations under Title VII, management-level personnel ratified the decision to terminate Plaintiff and to rely on his prior litigation history as a pretextual justification, in reckless disregard of his federally protected rights.

F. Damages

107. As a direct and proximate result of Defendants' retaliatory conduct, Plaintiff has suffered damages including lost wages, lost employment-related compensation, loss of future earnings capacity within his industry, emotional distress, mental anguish, and other economic and non-economic losses resulting from his termination and its consequences.

Page 28

108. Plaintiff is entitled to recover all damages available under Title VII, including compensatory damages, punitive damages as alleged above, and reasonable attorneys' fees and costs.

**COUNT III**
**TITLE VII — HOSTILE WORK ENVIRONMENT (SEXUAL HARASSMENT)**
(42 U.S.C. § 2000e-2)
(Against Winsupply NE San Antonio TX Co. and Winsupply Inc. Only)

109. Plaintiff repeats and incorporates by reference the allegations set forth in paragraphs 1 through 108 as if fully set forth herein.

A. Protected Class and Coverage

110. Plaintiff was an employee within the meaning of Title VII during the relevant period.

111. As alleged above, Defendants Winsupply NE San Antonio TX Co. and Winsupply Inc. were employers within the meaning of Title VII and, separately and/or as an integrated enterprise or joint employer, exercised sufficient control over Plaintiff's employment to be liable under Title VII.

B. Unwelcome Conduct

112. During Plaintiff's employment, Defendant Cleere, Plaintiff's direct supervisor, engaged in repeated, sex-specific, and sexually explicit conduct directed at Plaintiff, including explicit sexual comments, crude sexual references, sexually suggestive gestures, and humiliating remarks targeting Plaintiff's genitals, body, and masculinity, as detailed above (see ¶¶32–40).

113. This conduct included, among other things, sexually explicit gestures and statements made in the presence of customers and industry participants that ridiculed Plaintiff's perceived genital size and undermined his professional credibility, as well as explicit workplace comments directly referencing Plaintiff's genitals, as described in detail above (see ¶¶33–34).

114. The conduct was unwelcome, offensive, humiliating, and directed specifically at Plaintiff, and Plaintiff made clear through his objections and reactions that he did not welcome such conduct.

C. Conduct Based on Sex

115. The conduct described above was based on Plaintiff's sex because it involved explicit sexual content and repeated ridicule directed at Plaintiff's genitals, body, and masculinity, rather than generalized profanity or gender-neutral workplace vulgarity (see ¶¶32–35).

116. From the nature of the conduct—including repeated sexualized comments and gestures directed at Plaintiff's body and masculinity—a reasonable inference arises that the harassment occurred because of sex within the meaning of Title VII, including under the same-sex harassment framework recognized in *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998).

D. Severe or Pervasive Conduct

117. The conduct was sufficiently severe or pervasive to alter the terms and conditions of Plaintiff's employment. It occurred repeatedly over several months, included explicit sexual comments about Plaintiff's genitals and masculinity, occurred in both workplace and customer-facing settings, undermined Plaintiff's professional credibility with decision-makers, and was reinforced by physical intimidation when Plaintiff objected (see ¶¶32–40). The harassment was not limited to isolated remarks but formed a continuing pattern of conduct that a reasonable person would find hostile and abusive, particularly given that it was perpetrated by Plaintiff's direct supervisor and occurred in contexts affecting Plaintiff's professional standing and ability to perform his job.

118. Plaintiff subjectively perceived this environment as hostile, humiliating, and abusive, and a reasonable person in Plaintiff's position would likewise have found an environment in which a supervisor repeatedly makes sexually explicit, sex-specific comments about an employee's genitals, mocks his body in front of coworkers and customers, and responds to objections with physical intimidation to be hostile and abusive, including in light of the power imbalance between Plaintiff and his direct supervisor.

E. Employer Liability

119. At all relevant times, Cleere was Plaintiff's direct supervisor and had authority over Plaintiff's compensation, job responsibilities, and continued employment.

120. Defendants are liable for Cleere's conduct because the harassment was perpetrated by Plaintiff's supervisor and culminated in a tangible employment action, including Plaintiff's termination.

121. Plaintiff reported the harassment to Defendants, including through his January 12, 2026 escalation to Winsupply corporate leadership. Defendants failed to take corrective action, failed to investigate meaningfully, failed to discipline Cleere, and instead terminated Plaintiff three days later as alleged above (see ¶¶50, 52–54).

F. Willfulness and Punitive Damages

122. Defendants' conduct was undertaken with malice or with reckless indifference to Plaintiff's federally protected rights. Cleere repeatedly engaged in sex-specific, humiliating conduct, and Defendants' management-level personnel became aware of Plaintiff's complaints but failed to take reasonable steps to stop the harassment before terminating Plaintiff as reflected in the conduct and failures described above (see ¶¶32–40 and 50, 52–54).

123. Defendants' failure to investigate, failure to discipline Cleere, and decision instead to terminate Plaintiff after he invoked Defendants' complaint procedures warrant an award of punitive damages to the extent permitted by law.

G. Damages

124. As a direct and proximate result of Defendants' unlawful hostile work environment, Plaintiff has suffered damages including emotional distress, humiliation, mental anguish, loss of employment, and other damages recoverable under Title VII.

125. Plaintiff is entitled to recover all damages available under Title VII, including compensatory damages, punitive damages to the extent permitted by law, and other appropriate relief, as well as reasonable attorneys' fees and costs if recoverable.

**COUNT IV**
**DEFAMATION (INCLUDING DEFAMATION PER SE)**
(Texas Common Law)
(Against All Defendants)

126. Plaintiff repeats and incorporates by reference the allegations set forth in paragraphs 1 through 125 as if fully set forth herein.

A. Defamatory Statements

127. Defendants, including Cleere, made and published false statements of fact concerning Plaintiff to third parties, including prospective employers and industry participants within Plaintiff's professional network as alleged above (see ¶¶59, 65–71).

128. Defendants made statements including that Plaintiff had "sued a federal judge," "had sued contractors," and "had sued executives in the industry." Defendants also characterized Plaintiff as "litigation prone" and as someone who had "sued everyone," as alleged above (see ¶¶59, 65–68).

129. These statements were false. Plaintiff has not filed any civil action against Kevin Murphy, Judge Hoyt, any court personnel, or contractors associated with the SpaceX project, and his prior litigation history is limited to a small number of employment-related cases against a former employer and related entities, which are matters of public record as alleged above (see ¶¶65–67). The statements concerning Plaintiff's alleged lawsuits against judges, contractors, and executives are verifiable statements of fact and are false.

B. Publication

130. Defendants published these statements to third parties outside any legitimate internal employment decision-making process, including to Milford decision-makers and to individuals within the contractor network associated with the SpaceX project as alleged above (see ¶¶59, 68–70).

131. These statements were conveyed as factual warnings about Plaintiff and were understood by recipients as assertions concerning Plaintiff's actual litigation history and supposed litigation risk as reflected in the communications described above (see ¶¶59, 69–70).

C. Fault and Malice

132. Defendants knew that the statements were false or acted with reckless disregard for their truth or falsity. The statements were based on an inaccurate and misleading characterization of Plaintiff's litigation history and were made without reasonable investigation of publicly available records as alleged above (see ¶¶65–67).

133. Defendants made these statements with the intent, or with knowledge of a substantial likelihood, that they would interfere with Plaintiff's employment opportunities and professional relationships as alleged above (see ¶¶59, 63–64, 71–73).

D. Defamatory Meaning (Defamation Per Se)

134. The statements were defamatory because they falsely portrayed Plaintiff as a person who engages in abusive, excessive, and improper litigation, thereby injuring Plaintiff in his profession and exposing him to reputational harm within his industry as alleged above (see ¶¶59, 65–70).

135. The statements directly related to Plaintiff's fitness to perform his profession and to maintain professional relationships within the commercial mechanical piping and construction industry and therefore constitute defamation per se under Texas law.

E. Damages

136. As a direct and proximate result of Defendants' defamatory statements, Plaintiff lost a concrete employment opportunity with Milford Companies and suffered the loss or disruption of other employment and business opportunities within his industry as alleged above (see ¶¶58–60, 63–64, 76–77).

137. Defendants' statements were a substantial factor in causing these losses and in disrupting Plaintiff's relationships with multiple industry participants who ceased communications with Plaintiff following the dissemination of Defendants' statements as alleged above (see ¶¶70, 72–75).

138. The statements also caused harm to Plaintiff's professional reputation, standing in the industry, and ability to obtain employment, consulting, and business opportunities within his field as reflected in the conduct and communications described above (see ¶¶69–71).

139. Because the statements are defamatory per se, Plaintiff is entitled to presumed damages under Texas law.

140. In addition, Plaintiff has suffered actual damages, including lost income, lost employment opportunities, and other economic losses as alleged above (see ¶¶77–82). The

Milford position involved compensation discussed at approximately $150,000 annually, and the Aquatherm regional role under discussion was expected to be within a similar range. Plaintiff's resulting economic losses include lost past income, lost future earning capacity, and lost opportunity damages in amounts to be proven at trial.

F. Exemplary Damages

141. Defendants' conduct was undertaken with malice, entitling Plaintiff to an award of exemplary damages under Texas law.

142. As a result of Defendants' conduct, Plaintiff is entitled to recover all damages available under Texas law, including general damages, special damages, and exemplary damages, together with all other relief to which he is entitled.

**COUNT V**
**BUSINESS DISPARAGEMENT**
(Texas Common Law)
(Against All Defendants)

143. Plaintiff repeats and incorporates by reference the allegations set forth in paragraphs 1 through 142 as if fully set forth herein.

A. Disparaging Statements About Plaintiff's Business and Economic Interests

144. As alleged above (see ¶¶59, 65, 68–75), Defendants published false statements in a commercial context to industry participants and prospective employers that disparaged Plaintiff's fitness to be engaged for employment, consulting, training, vendor-development, and project-related opportunities in the commercial mechanical piping industry and induced third parties to refrain from entering into business relationships with Plaintiff. Defendants' statements were made in a commercial context and were intended to interfere with Plaintiff's ability to secure business relationships, consulting opportunities, and vendor engagements within his industry.

145.These statements concerned Plaintiff's alleged litigation history and were conveyed as factual assertions regarding Plaintiff's supposed litigation risk, as alleged above (see ¶¶59, 65, 68, 73).

146.This claim arises from interference with Plaintiff's specific economic interests and prospective business relationships, including the Milford opportunity, and addresses pecuniary harm resulting from Defendants' disparaging statements. This claim is directed at interference with Plaintiff's commercial and economic interests, including employment, consulting, vendor-development, and project-access opportunities, and is distinct from Plaintiff's defamation claim, which addresses reputational harm. This claim seeks recovery for distinct pecuniary losses arising from interference with Plaintiff's economic interests and prospective business relationships, independent of any reputational injury addressed by Plaintiff's defamation claim.

B. Falsity and Malice

147.The statements described above were false, and Defendants knew they were false or acted with reckless disregard for their truth or falsity. Defendants had access to public court records confirming the limited nature of Plaintiff's litigation history and nevertheless disseminated inaccurate and misleading statements to third parties in Plaintiff's industry, as alleged above (see ¶¶65–67).

148.Defendants made these statements with malice, meaning with knowledge of falsity or reckless disregard for the truth, and with the intent to interfere with Plaintiff's economic relationships or with conscious indifference to the substantial likelihood that such interference would occur.

C. Special Damages and Causation

149. Plaintiff suffered direct, identifiable pecuniary losses proximately caused by Defendants' statements, including the loss of a specific employment opportunity with Milford valued at approximately $150,000 annually and measurable lost income of approximately $40,000 through March 2026. These losses were the direct and immediate result of Defendants' disparaging statements and are not merely general reputational harm but concrete commercial losses tied to identifiable business opportunities. These damages are not speculative. The Milford opportunity had progressed to the point of identified decision-makers, confirmed business need, and coordinated steps toward formalization, and was terminated only after Defendants' statements. Plaintiff's losses are therefore capable of calculation with reasonable certainty and satisfy the special damages requirement under Texas law (see ¶¶58–60, 63–64, 76). These damages are quantifiable and capable of calculation with reasonable certainty based on identified compensation ranges and lost income history. The Milford opportunity alone constitutes a specific, realized economic loss sufficient to satisfy the special-damages requirement under Texas law.

150. The Milford opportunity was concrete and actively progressing toward formalization at the time Defendants' statements intervened. Identified Milford decision-maker Jeremy Hohn had engaged in active discussions regarding a defined national-level role; Hohn confirmed that Plaintiff met Milford's needs and coordinated steps to address Milford's "we do not hire from within" policy specifically to facilitate Plaintiff's hiring. The cessation of those discussions was caused directly and proximately by Defendants' statements and was not attributable to any change in Plaintiff's qualifications, availability, the status of the role, or any other variable independent of Defendants' conduct.

151. In addition, Defendants' conduct disrupted other existing economic relationships within Plaintiff's industry, including relationships associated with Aquatherm and the SpaceX-project contractor network. These additional disruptions corroborate the economic impact of Defendants' conduct and are pleaded as supporting context, not as necessary elements of Plaintiff's special damages, as alleged above (see ¶¶60–64, 69–70, 72–76). The abrupt and near-simultaneous cessation of communications across multiple independent industry participants—each of whom had longstanding, active relationships with Plaintiff that continued without interruption until the period immediately following Defendants' statements—is consistent with a disseminated narrative and not with any change in Plaintiff's conduct, qualifications, or availability, further confirming the causal role of Defendants' false statements in producing Plaintiff's economic losses.

152. Plaintiff's special damages include, at minimum: (a) the lost Milford compensation opportunity, valued at no less than $150,000 annually; (b) lost income from the date of termination through the present, estimated at approximately $40,000 through March 2026 and continuing to accrue at a rate consistent with Plaintiff's pre-termination compensation history; and (c) lost consulting, vendor-development, and project-access revenues within the SpaceX contractor network and other industry relationships, the full scope of which will be established through discovery.

D. Malice and Exemplary Damages

153. Defendants' conduct was undertaken with malice and conscious indifference to Plaintiff's rights and economic interests, entitling Plaintiff to recover punitive and exemplary damages to be proven by clear and convincing evidence.

**COUNT VI**
**TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS**
**RELATIONS**
(Texas Common Law)
(Against All Defendants)

154. Plaintiff repeats and incorporates by reference the allegations set forth in paragraphs 1 through 153 as if fully set forth herein.

A. Reasonable Probability of Business Relationship

155. As alleged above (see ¶¶57–59, 63–64), Plaintiff had a reasonable probability of entering into a specific business relationship with Milford Companies for a national-level business development and technical training role in the polypropylene piping market. That probability is reflected by identified decision-makers, confirmation that Plaintiff met Milford's needs, and active discussions involving concrete steps toward formalizing Plaintiff's employment. Absent Defendants' interference, those discussions would likely have resulted in a formal offer. Plaintiff additionally had a prospective business relationship with Aquatherm, a polypropylene piping manufacturer for which Plaintiff had served as National Training Director and with whose leadership, including Michael Segala, Plaintiff maintained direct relationships. In late 2025, Segala represented to Plaintiff that he intended to recommend Plaintiff for a regional management role in connection with anticipated structural changes to Aquatherm's distribution model. Although the Aquatherm opportunity was less advanced than the Milford opportunity and is pleaded as an additional, corroborating prospective relationship rather than as the sole basis for this claim, it nonetheless had a reasonable probability of materializing based on Plaintiff's established credentials and Segala's direct representations.

B. Independently Tortious or Unlawful Conduct

156. As alleged above (see ¶¶59, 65, 68, 71–74), Defendants intentionally interfered with Plaintiff's prospective relationship with Milford by communicating false statements of fact regarding Plaintiff's litigation history and alleged litigation risk, including assertions that Plaintiff had sued judges, contractors, court personnel, and industry executives and was "litigation prone" and had "sued everyone," each of which was false.

157. This conduct constitutes independently tortious conduct under Texas law, including defamation and business disparagement as alleged in Counts IV and V. Defendants' interference with Plaintiff's prospective business relationships was independently unlawful because it was accomplished through the publication of false statements of fact concerning Plaintiff's alleged litigation history, including statements that Plaintiff had sued judges, contractors, and industry executives. Such statements constitute defamation and business disparagement under Texas law, and therefore satisfy the requirement that the interference be based on independently tortious or unlawful conduct.

C. Intent and Knowledge

158. Defendants acted with the intent to interfere with Plaintiff's prospective relationship with Milford or with knowledge that such interference was substantially certain to occur, as reflected in their awareness of Plaintiff's active employment discussions and the foreseeable effect of communicating false statements to Milford decision-makers (see ¶¶57–59, 63, 71).

D. Proximate Cause

159. As alleged above (see ¶¶59, 63–64, 76), Defendants' independently tortious conduct proximately caused the loss of the Milford opportunity. Milford representative Harris stated expressly that Cleere's false statements were the reason Milford would not continue

discussions—not Plaintiff's qualifications, not the status of the role, and not any other factor. Milford communications, which had been active and progressing toward formalization, abruptly ceased in the same compressed timeframe as Cleere's communications, with no intervening change in any other variable. No independent business factor explains Milford's decision to cease communications, and the timing and content of Defendants' statements directly caused the termination of that opportunity.

E. Damages and Exemplary Damages

160. As a direct result of Defendants' interference, Plaintiff suffered actual damages including: (a) the loss of the Milford employment opportunity and its associated compensation, valued at no less than $150,000 annually based on discussions with identified Milford decision-makers; (b) general lost income from the date of termination through the present, estimated at approximately $40,000 through March 2026 and continuing to accrue; and (c) the loss of the Aquatherm-related regional management opportunity, the full value of which is expected to be established through discovery. These damages are distinct from and in addition to Plaintiff's Title VII and breach of contract damages (see ¶¶76, 81–82). The loss of the Milford employment opportunity and its associated compensation, by itself, constitutes actual economic damage sufficient to satisfy the damages element of Plaintiff's tortious-interference claim.

161. Defendants' conduct was undertaken with malice and conscious indifference to Plaintiff's rights and economic interests, entitling Plaintiff to recover all damages available under Texas law, including actual damages, consequential economic losses, and punitive and exemplary damages.

## VI. CONDITIONS PRECEDENT

162. All conditions precedent to Plaintiff's claims for relief have been satisfied or have occurred.

163. With respect to Plaintiff's Title VII claims, Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 460-2026-05401, on April 6, 2026, alleging sex-based harassment, hostile work environment, and retaliation arising from the conduct described in this Complaint.

164. The Title VII claims asserted in this Complaint are within the scope of the EEOC charge and are like or related to, and could reasonably be expected to grow out of, the EEOC's investigation of that charge.

165. The EEOC issued Plaintiff a Notice of Right to Sue on April 9, 2026. This action is being filed within ninety (90) days after Plaintiff's receipt of that Notice.

## VII. PRAYER FOR RELIEF

166. WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and against Defendants and award the following relief:

A. Contract Damages (Count I)

167. Recovery of all unpaid and underpaid compensation owed under Plaintiff's employment agreement, including fixed monthly compensation, together with prejudgment and post-judgment interest as allowed by law;

B. Title VII Damages (Counts II–III)

168. All relief available under Title VII of the Civil Rights Act of 1964, including back pay, front pay or reinstatement, compensatory damages for emotional

distress and mental anguish, punitive damages subject to applicable statutory caps, and all other relief authorized by law;

C. Tort Damages — Defamation, Business Disparagement, and Tortious Interference (Counts IV–VI)

169. All general, special, and consequential damages recoverable under Texas law, including damages for loss of reputation, loss of professional standing, loss of business opportunities, loss of prospective employment (including the Milford opportunity), and other pecuniary losses proximately caused by Defendants' conduct;

D. Exemplary Damages

170. Exemplary and punitive damages under Texas law based on Defendants' malice, fraud, or gross negligence, to be proven by clear and convincing evidence;

E. Equitable Relief

171. Front pay in lieu of reinstatement, or, if reinstatement is feasible and appropriate, reinstatement to Plaintiff's former position under lawful and non-retaliatory conditions, together with such other equitable relief as permitted by law and deemed appropriate by the Court;

F. Attorneys' Fees and Costs

172. Reasonable attorneys' fees, if recoverable under applicable law, expert fees where authorized, and costs of court, including under 42 U.S.C. § 2000e-5(k);

G. Interest

173. Prejudgment and post-judgment interest as allowed by law on all recoverable damages; and

H. All Other Relief

174. Such other and further relief, at law or in equity, to which Plaintiff may be justly entitled.

## VIII. JURY DEMAND

175. Plaintiff demands a trial by jury on all issues so triable.

May 8, 2026                                         Respectfully Submitted,

Ronald A. Blair
2725 Woodall Drive, Unit 1804
Cedar Park, TX 78613
717-808-4671
r.anthony.blair@gmail.com

Plaintiff, Pro Se